**Eddie PIERCE, Jr., et al., Plaintiffs,**

v.

**OHIO DEPARTMENT OF REHABIL-
ITATION AND CORRECTIONS,
et al., Defendants.**

No. 4:01CV1982.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 28, 2003.

Daniel S. Smith, Columbus, OH, Carrie M. Varner, Ohio Civil Service Employees Association, Westerville, OH, for Plaintiffs.

Anne E. Thomson, Jack W. Decker, Office of the Attorney General, Columbus, OH, for Defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

The above-captioned matter represents another chapter in what has become a

continuing dispute between the Ohio Department of Rehabilitation and Corrections and its correctional officers. The officers complain that the department subjected them to strip searches in violation of the Constitution and a settlement agreement from a prior lawsuit. The parties' dispute *sub judice* began on November 19, 2000, when the individual plaintiffs were subjected to strip searches upon arriving to work, but arguably has its genesis in events that transpired much earlier. That is, a prior lawsuit brought by the department's correctional officers against the department resulted in a settlement agreement and a revamping of the prison's policies for strip searching its employees. The plaintiffs' claims in the current dispute consist of, *inter alia*, § 1983 claims for violations of the Fourth, Fifth, and Fourteenth Amendments, and a pair of state law claims, including one for breach of contract (the settlement agreement of the prior litigation).

Currently before the Court is Defendants' "Motion to Dismiss and/or for Qualified Immunity and/or for Summary Judgment" (Doc. No. 55).[1] Plaintiffs have filed their response in opposition (Doc. No. 56), and Defendants have filed a reply (Doc. No. 57). In their motion, Defendants raise, *inter alia*, issues of jurisdiction and qualified immunity.

## I. FACTUAL BACKGROUND

The events during two time periods are important to understanding the issues of this case. The first period consists of the events from the prior litigation, which gave rise to an overhaul of the department's policies for strip searching its employees. The second period consists of the events leading up to, and including, the searches conducted at the Trumbull Correctional Institution ("TCI") on November 19, 2000. The facts presented here are undisputed, and, if not, set forth in a light most favorable to the plaintiffs pursuant to the qualified immunity standard, *infra* Part II.B.

### A. The Prior Litigation

As mentioned, the subject matter of this dispute is not new. The department and its employees previously fought over the constitutional propriety of strip searching correctional officers. Plaintiff Ohio Civil Service Employees Association/AFSCME Local 11 AFL–CIO ("OCSEA" or "Union") and several members/employees sued the Ohio Department of Rehabilitation and Corrections ("ODRC" or "Department") and its various officials after several correctional officers were strip searched allegedly without probable cause or search warrants. The case resulted in a published opinion, which examined the same, primary defense pled here: qualified immunity.

On February 22, 1985, the OCSEA and nine prison guards brought suit against the Department and several of its officials under 42 U.S.C.1983 (1996) and 42 U.S.C. § 1985 (1871). The plaintiffs alleged that, from 1979 to 1985, the Department subjected them to strip searches and body cavity searches without probable cause or search warrants in violation of the Fourth

1. Defendants' initial motion was entitled, "Motion to Dismiss and/or for Qualified Immunity" (Doc. No. 11). In their reply to this motion, Defendants incorporated a motion for summary judgment (Doc. Nos.26, 29), which prompted the Court to set dates for a response and a reply with respect to the newly-filed motion (Doc. No. 27). After the Court conducted oral arguments on the motions, which had become quite complex after the filing of numerous supplemental materials, the Court denied the pending motions subject to their re-filing as a single, consolidated motion (Doc. No. 53). The parties dutifully complied with the Court's direction and fully briefed a single, consolidated motion (Doc. Nos. 55, 56, 57).

Amendment. The guards also alleged that some of the searches were motivated by race, retaliation, and the intent to discipline.

The procedural posture of the prior case includes two appeals to the Sixth Circuit. Leading to the first appeal, the defendants moved the district court for judgment on the pleadings, invoking the defense of qualified immunity on the basis that the rights asserted by the plaintiffs were not clearly established statutory or constitutional rights. The district court rejected the defense. The Sixth Circuit remanded, noting that the district court failed to make explicit findings in rejecting qualified immunity. *Ohio Civil Service Employees Ass'n v. Seiter,* No. 85–3836, 1986 WL 16458, at *1, 785 F.2d 309 (6th Cir. Jan 24, 1986) (unpublished table decision). On remand, the district court again rejected the Department's qualified immunity defense, providing specific findings in its analysis as instructed by the circuit. The defendants again appealed to the Sixth Circuit, which reversed the district court. *Ohio Civil Service Employees Ass'n v. Seiter,* 858 F.2d 1171, 1178 (6th Cir.1988) ("*Seiter*").

To understand fully the significance of *Seiter,* an examination of the district court's rationale is necessary. The district court rejected the defendants' qualified immunity defense based on the Supreme Court's decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and the Second Circuit's decision in *Security & Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187 (2d Cir.1984). From these opinions, the district court derived the following three principles: a *per se* rule for the unlawfulness of any warrantless search not falling within an articulated exception; a basic constitutional right to be free from unreasonable searches, unless the alleged conduct fell within an exception to the above

*per se* rule; and a prohibition of strip searches and body cavity searches without at least a reasonable suspicion of wrongdoing. *Seiter,* 858 F.2d at 1172–73. Applying these principles to the facts of the case, the district court rejected the defendants' qualified immunity defense. *Id.* at 1172.

In reviewing this decision, the Sixth Circuit examined the then-current Supreme Court cases that shaped the face of qualified immunity, namely *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), and *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Against the background of these cases, the circuit framed the issues as: "[W]hether the Fourth Amendment encompasses the right to be free from warrantless strip and body cavity searches and, if so, whether that right was clearly established at the time the searches took place." *Seiter,* 858 F.2d at 1173–74. Finding error in the lower court's decision, the circuit held that "the district court was required to find both a subjective expression of privacy and an approval of that expectation by society, in order to avoid a finding of qualified immunity." *Id.* at 1175. In the end, the court determined from its review of other circuits' cases and instructive Supreme Court decisions that the right of prison guards to be free from strip searches and body cavity searches was not clearly established at the time the searches occurred. *Id.* at 1177–78. The circuit again remanded, but this time for a trial on the plaintiffs' other claims. The litigation ended, however, in a settlement, which culminated into a renovation of the Department's policy towards strip searches.

The details of the settlement in *Seiter* bear considerable relevance to the instant dispute. The text[2] of that agreement provided:

---

2. Two footnotes in the agreement, which pro- vide some procedural history, are excluded

1. This Settlement Agreement is made between Plaintiffs, Ohio Civil Service Employees Association, Cris Beesler, Douglas A. Gerhart, Michael A. Hill, Randy M. Martin, Edward L. Brooks, Phillip Reed and Jeffrey Craft, and Defendants George Wilson, Director of the Ohio Department of Rehabilitation and Corrections ("ODRC") and certain other ODRC employees.

2. This Settlement Agreement is made as a compromise between the parties for the complete and final settlement of all claims, differences, and causes of action with respect to the within action.

3. The parties understand that this settlement is a compromise of a disputed claim and is not to be construed as an admission of liability on the part of the defendants.

4. It is understood by the parties that the facts upon which this Settlement Agreement is made may hereafter prove to be other than or different from the facts now known by either of them or believed by either of them to be true. All of the parties hereto expressly accept and assume the risk of the facts proving to be so different, and all of the parties hereto agree that all the terms of this Settlement Agreement shall be in all respects effective and not subject to termination or recision [sic] by any such difference in facts.

5. The parties agree that the terms of this Settlement Agreement bind them, and their heirs, agents, employees, assigns, and successors in interest.

6. Employees of the Ohio Department of Rehabilitation and Correction ("ODRC") [sic] entering or who have entered a correctional institution may be searched by use of a magnetometer or similar device, by a pat-down search and by an examination of the contents of pockets, bags, purses, packages and other containers which the employees desire to bring into the institution. Such searches may be conducted without cause at any time while the employees are inside of the institution.

7.(a) Any strip search or any other body search, including a body cavity search, that is more intrusive than the type of search allowed by paragraph 6 above, may be made only on the basis of reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the person to be searched is then in possession of a weapon, drugs or other contraband.

(b) Prior to conducting such a search, the employee to be searched shall be provided and may keep a written statement setting forth the specific objective facts upon which the search is based. The written statement shall contain at a minimum: the date and time the information was received; the names of the individuals to whom the information was provided, unless disclosure of the names would jeopardize the safety of the individuals or would interfere with receiving future information from the individuals; the information itself; and the basis of the informant's knowledge. The written statement shall be preserved.

(c) In case of emergency, where time constraints make it impossible to prepare the written statement before conducting the search, the information required by the written statement shall be orally stated to the employee to be searched and a written statement prepared and given to the employee within twenty[-]four (24) hours after the search, or within twenty[-]four (24) hours after the employee returns to work where the employee leaves work

from the reproduction here. Otherwise, the agreement is presented here in its entirety.

before the written statement can be prepared.

(d) Such a search is to be made only on the express authority of the highest officer present in the institution and conducted by an employee of the same sex in a private setting. The employee searched shall have the right to select a witness of his or her choice from among his or her fellow employees then on duty or present in the institution.

(e) Searches that involve the physical probing of any body cavity shall be conducted only by licensed medical personnel.

(f) Complaints regarding the written statement required by paragraph 7(b) above, including a request to review the cause for suspicion supporting the search, may be addressed to the Director of the Department of Rehabilitation and Correction within ten working days of the search. The Director or his designee may review the complaint, the written statement, and any records pertaining to the cause for suspicion as appropriate. The Director or his designee shall respond to such complaint in writing and, when appropriate, shall include an opinion on the adequacy of the cause for suspicion. The form of the written statement and the cause for search may not be grieved or arbitrated under the Collective Bargaining Agreement between the State of Ohio and the Ohio Civil Service Employees Association ("OCSEA"), Local 11, American Federation of State, County and Municipal Employees ("AFSCME"), or any other collective bargaining agreement between the State of Ohio and corrections employees.

8. Within two (2) weeks of any search conducted pursuant to the procedures specified in paragraph (7)(b) above, Defendants shall serve a copy of the written statement upon the general counsel of the union currently representing corrections officers or his designee.

9. If a future decision rendered by the United States Court of Appeals for the Sixth Circuit or the United States Supreme Court should articulate a different standard for conducting searches of prison employees than is contained in this Settlement Agreement, the parties agree that this Settlement Agreement shall be modified to reflect the change in the law.

10. Plaintiffs agree that all claims, demands, rights, causes of action, costs, expenses and any and all other damages to them on account of or in any way arising out of the allegations contained in the above[-]referenced case are hereby released, settled, satisfied, discharged and compensated.

11. Plaintiffs, upon execution of this Settlement Agreement, agree to enter a Stipulation of Dismissal dismissing with prejudice all claims of any kind or nature which they have or may have against any other party to this Settlement Agreement based upon any and all matters up to and including the date of execution of this Settlement Agreement. Further, plaintiffs agree that they shall not file, or permit anyone to file on their behalf, any judicial, administrative, statutory or contractual claim, charge, suit or action directly or indirectly related to the allegations set forth in the above[-]referenced case.

12. Plaintiffs, their heirs, successors and assigns, hereby hold harmless from any liability and forever discharge the defendants, their agents, heirs, servants and employees, personally or in any capacity, from any and all claims arising directly or indirectly from the instant case, including their respective searches. No damages will be paid to any of the plaintiffs. Upon execution of this Settle-

ment Agreement, Plaintiffs agree to execute releases so discharging the defendants from liability.

13. Defendants shall pay $55,000.00 in attorneys' fees and expenses to the law firm of Kirschner, Weinberg and Dempsey as counsel for the plaintiffs. This amount shall constitute a total monetary settlement for all attorneys' fees for all counsel appointed or retained.

14. All costs associated with the above[-]referenced case, including court costs and any other expenses incurred by the plaintiffs in relation to this case, shall be borne equally by the parties, each party paying its own costs.

15. Plaintiff, OCSEA/AFSCME, and Defendant, ODRC, agree to cooperate in the issuance of a joint press release discussing the terms and conditions of this Settlement Agreement. No other communication with the media shall occur prior to the issuance of the joint press release described above.

16. The parties agree that the obligations of the State of Ohio shall at all times be subject to the provisions of § 126.07, Ohio Revised Code.

17. This Settlement Agreement shall be in effect and binding upon the parties after all of the parties and their counsel as listed below have signed it. Upon signature by all of the persons listed below, the parties to this Settlement Agreement agree that it shall represent the end of all litigation related in any way to the above[-]referenced[-]to case.

In witness whereof, the parties hereto have set their hands as of the dates noted below.

[signed]

(Settlement Agreement executed Jan. 1990 in *Ohio Civil Service Employees Ass'n v. Seiter*, No. C–1–85–530, at 1–8 (footnotes omitted) (Compl. Ex. 1 (Doc. No. 1)) ("*Seiter* Agreement").)

B. *The Strip Searches of Plaintiffs*

From an unidentified date in 1999 up until November 17, 2000, Warden Julius Wilson received information that Plaintiffs Eddie Pierce, Jr., and Brod Muse (both correctional officers) were involved in trafficking drugs to inmates within the Trumbull prison. (Wilson Dep. Tr. at 30.) Similar information came to him about Billie Butler and Robert Clark (also correctional officers), but during a more limited time frame: from about March 2000 until November 17, 2000. (Wilson Dep. Tr. at 30–31.) Wilson estimated that the information on Clark came from two individuals, on Butler from four individuals, on Pierce ten individuals, and on Muse ten individuals. (Wilson Dep. Tr. at 32–34.) Defendants have worked hard to preserve the confidentiality of both the informants' identities and their information; so, it is not clear from the record the specifics of the information provided, whether these individuals were other officers, inmates, or visitors, or whether there was any overlap among the numbers.

On November 17, 2000, or two days prior to the strip searches at issue, Johnnie Mae Fuller, a lieutenant at TCI, came to Wilson with an inmate tip about drugs coming into the facility on the following Sunday morning. (Fuller Dep. Tr. at 34–37; Wilson Dep. Tr. at 36.) Apparently, the informant identified the B1 entrance as the entry way for the drugs (Fuller Dep. Tr. at 37), though it is not clear from the record whether that was the only employee entrance or if there were others. The informant identified those persons involved as Pierce, Muse, Butler, and Clark[3] as

---

**3.** Apparently, there was more than one "R. Clark" working at TCI at the time. (Fuller Dep. Tr. at 31–33.)

well as four other officers and a sergeant who are not parties to this suit. (Fuller Dep. Tr. at 38–40.) Fuller's interview with the informant lasted approximately two hours and was tape recorded. (Fuller Dep. Tr. at 41, 46.) From this information, Wilson authorized the strip searches that are the subject of this suit.

On November 19, 2000, at 5:30 A.M., the Department set up a folding table next to a metal detector at the B1 employee entrance of TCI. Keith Fletcher (the facility's personnel director), Andrea Carol (a facility administrator), Julie Loomis (the deputy warden), and Gary Schultz (the warden's administrative assistant) stood behind the table. Standing nearby were John Coleman (a major) and Fuller, who were both to conduct the strip searches. A men's restroom and a women's restroom, where the strip searches took place, were located nearby. All employees entering the building were patted down, and subjected to a search of their shoes and lunchboxes.

The Department stopped and separately strip searched Clark, Muse, Pierce, Richard Brant (who is not a party to this litigation), and Butler. First, Clark was separated from his co-workers entering the prison and led to the nearby men's restroom. According to Clark, Coleman said that Clark was randomly selected to be strip searched. (Clark Dep. Tr. at 17.) Then, at the direction of Coleman, Clark stripped down to his underwear (Clark Dep. Tr. at 17), which Defendants describe as "tight[,] spandex-like undershorts" (Defs.' Mot. at 9). According to Coleman, there were no noticeable bulges in Clark's underpants and, thus, he instructed him to

stop and re-dress. (Coleman Dep. Tr. at 42–43.) The Department found no contraband on Clark. (Coleman Dep. Tr. at 47.)

Coleman searched Muse second. Muse was standing in line with the rest of the prison guards seeking entry that morning, when Schultz, the warden's assistant, told Muse that the major, Coleman, wanted to see him. Muse left the line and found Coleman, who informed Muse that he was going to be strip searched. Muse asked Coleman whether the strip searches were racially motivated, to which Coleman responded that the searches were random. (Muse Dep. Tr. at 17, 21.) Muse demanded that the state police conduct the strip search, but eventually relented. (Coleman Dep. Tr. at 64, 66; Muse Dep. Tr. at 18.) In the men's restroom, he removed all of his clothing and bent over[4] for a visual examination between his legs. (Muse Dep. Tr. at 22.) Pierce walked into the bathroom for his strip search while Muse was still re-dressing.[5] (Muse Dep. Tr. at 18; Pierce Dep. Tr. at 17.) Again, the Department's search turned up empty. (Muse Dep. Tr. at 22.)

Pierce was next to be strip searched. While waiting in line, he allegedly discovered that he left his hat and gloves in his car and exited the line and building to retrieve them. (Pierce Dep. Tr. at 14.) Upon his return and after being led into the men's restroom, where the prior two searches were conducted, Pierce removed all of his clothing at Coleman's instruction, including dropping his pants to his ankles and, eventually, removing his pants completely. (Pierce Dep. Tr. 16.) He, like Muse, removed his underwear, bent over, and squatted[6] (Pierce Dep. Tr. at 16).

---

4. Coleman denies asking Muse to bend over or squat. (Coleman Dep. Tr. at 67.)

5. At his deposition, Coleman could not remember who walked in on whom, i.e. whether Muse was led into the restroom while Pierce was re-dressing or vice-versa. (Coleman Dep. Tr. at 61–62.)

6. Coleman denies asking Pierce to squat. (Coleman Dep. Tr. at 61.)

Given Pierce's sudden departure from the search line, the Department also searched his vehicle. (Coleman Dep. Tr. at 58.) No contraband was found either on his person or in his vehicle. (Coleman Dep. Tr. at 58–59.)

Last to be searched was Butler,[7] who was the only woman to be subjected to the searches at issue in this litigation. Fuller pulled Butler out of the line of employees waiting to be patted down and conducted the strip search of Butler in a nearby restroom. (Butler Dep. Tr. at 25.) After patting her down, Fuller gave an instruction to Butler to disrobe fully, with which she complied. (Butler Dep. Tr. at 25.) Fuller inspected Butler's mouth and then directed her to jump up and down, which she did. (Butler Dep. Tr. at 26–27.) While Butler was re-buttoning her blouse, one of Butler's co-workers walked into the restroom. (Butler Dep. Tr. at 27.) No contraband was found.

None of the searches involved any probing or other invasive procedures. Despite the *Seiter* Agreement, there were no witnesses to any of the searches. Although Defendants indicate that the guards did not request witnesses, they make no indication of any affirmative effort on their part to have witnesses present. Additionally, no prior verbal or written notice was given to any of the plaintiffs. Approximately nine days later, the Department provided Plaintiffs with the standard notice forms. Defendants indicate in their motion: "Why it took until then to provide them to the plaintiffs is unexplained." (Defs.' Mot. at 12.)

Since the filing of this suit, it appears that Muse and Butler have left the Department. (Oral Arg. Tr. at 7, 21–22, 32.) According to Defendants, Butler voluntarily resigned and Muse was terminated.

(Oral Arg. Tr. at 7.) Plaintiffs indicated, however, that Muse was grieving his termination through the Union. (Oral Arg. Tr. at 32.) No other information has been provided regarding Muse's employment with the Department.

## II. LEGAL STANDARD

Defendants' motion for summary judgment raises two legal standards under which the Court must examine this case. The first is the standard for summary judgment. The second is the standard for qualified immunity.

### A. *Summary Judgment*

 Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. On a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). *See, e.g., United States v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the non-moving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *id.*

---

7. Prior to Butler's search, the Department searched Richard Brant. As previously indicated, Brant is not a party to this litigation and the circumstances of his search are not relevant to this dispute.

822

at 323, 106 S.Ct. 2548, the party in opposition "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (equating the standard for judgment as a matter of law under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) and *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

**B. Qualified Immunity**

 " '[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hoover v. Radabaugh,* 307 F.3d 460, 465 (6th Cir. 2002) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). Qualified immunity protects a government official not only from damages, but from suit. *Id.* The doctrine of qualified immunity serves the purpose of protecting public officials from undue interference with the discharge of their duties and potentially disabling threats of liability. *Vakilian v. Shaw,* 335 F.3d 509, 516 (6th Cir.2003). To serve this purpose effectively, qualified immunity is considered a threshold question, which is to be resolved at the earliest possible stage of litigation. *Id.*

A court's first inquiry in a qualified immunity analysis is whether a plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer,* 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Hoover,* 307 F.3d at 466; *Bell v. Johnson,* 308 F.3d 594, 601 (2002). If so, the second inquiry is whether that constitutional violation involved clearly established statutory or constitutional rights of which a reasonable person would have known. *Hope,* 536 U.S. at 739, 122 S.Ct. 2508; *Hoover,* 307 F.3d at 465.

**III. ANALYSIS**

The Department and its officials have gone through extraordinary lengths to defend this suit, raising numerous issues in their motion for summary judgment even

though some of their arguments appear to lack merit. A comprehensive and orderly resolution of Defendants' motion requires a categorization of its issues. With that in mind, the Court divides its analysis (but consolidates Defendants' various arguments) into three areas of discussion: (A) jurisdiction, (B) qualified immunity, and (C) resolution of Plaintiffs' state law claims.

### A. *Jurisdiction*

■■■■ The logical place to begin is the Department's jurisdictional challenges. The Court's jurisdiction over the constitutional claims is premised on 28 U.S.C. § 1331 (1980) (federal question jurisdiction) and 28 U.S.C. § 1367(a) (1990) (supplemental jurisdiction for state law claims). If, however, Plaintiffs lack standing, as Defendants contend, the claims suffering from such defect must be dismissed for lack of jurisdiction. *See Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir.2002). To satisfy Article III standing, a plaintiff must establish three elements: "(1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue—the injury must be fairly traceable to the defendant's action; and (3) likelihood that the injury would be redressed by a favorable decision of the Court." *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 566 (6th Cir.2002); *see also Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir.2002); *Adult Video Ass'n v. U.S. Dept. of Justice*, 71 F.3d 563, 565 (6th Cir.1995). The party seeking entrance to the federal court bears the burden of alleging sufficient facts to demonstrate that he is a proper party to bring about a judicial resolution of the dispute. *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Adult Video Ass'n*, 71 F.3d at 566.

Defendants argue that the *Seiter* Agreement negates any case or controversy between the parties, thereby depriving this Court of jurisdiction to hear Plaintiffs' constitutional claims. According to Defendants, their searches of Department employees are governed by the *Seiter* Agreement, which "meets or exceeds any arguable constitutional requirements." (Defs.' Mot. for Summ. J. at 26.) As far as any past constitutional violations are concerned, "absolutely no evidence [exists] that ODRC has ever conducted any strip search of anyone … based upon less than 'reasonable suspicion.'" (Defs.' Mot. for Summ. J. at 27.) As for the threat of any future constitutional violations, Defendants say that "the [*Seiter*] agreement has disposed of any case or controversy between [the Union] and the State of Ohio regarding the 'cause,' if any, necessary to sustain a strip search of ODRC employees." (Defs.' Mot for Summ. J. at 26.) With no past search conducted on grounds less than reasonable suspicion and no threat of such a search in the future, Defendants argue that no case or controversy exists to establish the Court's jurisdiction to issue declaratory relief.

Without even going into Plaintiffs' response to Defendants' jurisdictional challenge,[8] the Court finds a fundamental flaw in the Department's argument that a case or controversy is lacking. It is perhaps undisputed that the parties were and are bound by the *Seiter* Agreement. It *is* hotly disputed, however, whether that document dictates the Fourth Amendment standard for searches in the context of strip searches of correctional officers. Thus, for Defendants simply to assume that the *Seiter* standards "meet or exceed any arguable constitutional requirements"

---

8. In any event, Plaintiffs do not offer much in the way of a response to Defendants' case or controversy requirement, arguing simply that declaratory and injunctive relief are proper and long overdue. (Pls.' Memo. in Opp'n to Summ. J. at 25–27.)

in their attempt to show no case or controversy exists makes no sense. That is, the case or controversy exists in the very assumption upon which Defendants base their challenge to jurisdiction. Moreover, the suggestion here that the *Seiter* Agreement meets or exceeds constitutional requirements undercuts Defendants' later argument that the Court should refrain from making a declaration of Plaintiffs' constitutional rights. In order to buy into Defendants' argument against a finding of jurisdiction, the Court would implicitly accept that *Seiter* sets the constitutional standard for strip searching prison guards—a declaration that Defendants seemingly wanted to avoid.

■ Plaintiffs have satisfied all of the elements for a case or controversy. Again, to establish standing, a plaintiff must establish: "(1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue—the injury must be fairly traceable to the defendant's action; and (3) likelihood that the injury would be redressed by a favorable decision of the Court." *Beztak Land*, 298 F.3d at 566. The alleged injury is the Defendants' act of strip searching Plaintiffs without reasonable suspicion. A clear connection exists between the injury and the conduct at issue: it is undisputed that the Department subjected Plaintiffs to these strip searches, though hotly disputed whether they were conducted with reasonable suspicion. The likelihood that the injury would be redressed by a favorable decision of this Court is great. Setting the constitutional standard for such searches would deter future searches or at least provide a constitutional remedy for violations. Finally, Plaintiffs have alleged sufficient facts to demonstrate that they are proper parties to bring about a resolution of the constitutional standard(s) necessary to conduct strip searches of prison employ-

ees: They are employees[9] who have been strip searched and are subject to future strip searches and/or violations of the *Seiter* Agreement by the Department by way of their continued employment.

The existence of the *Seiter* Agreement does not diminish the import of establishing the applicable constitutional rights in the context of this case. The judiciary must be necessarily concerned that the government conform its conduct to the constitutional standards that protect the people. *See Miranda v. Arizona*, 384 U.S. 436, 486 n. 55, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Strickland v. Washington*, 466 U.S. 668, 707, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (Brennan, J., concurring in part and dissenting in part). After all, the ultimate responsibility for resolving constitutional questions falls on the courts. *Miranda*, 384 U.S. at 486 n. 55, 86 S.Ct. 1602. While persons may be free simply to ignore a contractual provision (though face contractual liability), a constitutional command cannot be similarly ignored. As the Sixth Circuit has held in a case where the dispute *was* deemed moot, defining the terms of a settlement agreement between parties does not necessarily bind the parties; if the court's definition were unsatisfactory to them, they could simply redraft their agreement. *Int'l Union, United Auto., Aerospace, Agric. & Implement Workers of Am. v. Dana Corp.*, 697 F.2d 718, 723 (6th Cir.1983). On the other hand, the standards set for a constitutional command cannot be altered or ignored by the parties, though the Department could choose to set a higher standard. Thus, if the Court were to establish a standard under which strip searches of prison guards were constitutionally permissible, the affected governmental entities could conform their policies and conduct to such a standard; otherwise, future injured par-

---

9. At least two of the individual plaintiffs are undisputedly employees of the Department.

ties could seek a constitutional remedy. A contractual obligation simply does not carry the same force of a constitutional command.

Moreover, the Defendants are correct in indicating that, generally, a settlement moots a dispute. *United States ex. rel. Roby v. Boeing Co.*, 302 F.3d 637, 641 (6th Cir.2002); *ITT Rayonier Inc. v. United States*, 651 F.2d 343, 345 (5th Cir.1981). The dispute it settles, however, is the dispute that was the subject of the litigation. Importantly, Plaintiffs raise claims based on § 1983. Had Plaintiffs brought this action based on the strip searches between 1979 and 1985, this Court would agree that the *Seiter* Agreement mooted the dispute and dismiss this case for lack of jurisdiction. After all, the settlement agreement operates as a dismissal of all claims "based upon any and all matters *up to and including* the date of execution of th[e] Settlement Agreement." (Settlement Agreement executed Jan. 1990 in *Ohio Civil Service Employees Ass'n v. Seiter*, No. C–1–85–530, at 5 (emphasis added).) Plaintiffs, however, allege claims, including § 1983 claims for damages, that arise after the date of execution of the *Seiter* Agreement. That is, the individual plaintiffs in this case were subjected to strip searches that were separate and distinct from those that were at issue in *Seiter*.[10]

Additionally, the cases cited by Defendants in their motion are not inconsistent with the decision reached here. None of those cases presents the scenario where the post-settlement dispute arises from a completely different set of facts than those of the pre-settlement dispute. Instead, in each of those cases, the factual background and legal disputes that began the litigation remained constant throughout the proceedings. For example, in *Dana Corp.*, upon which Defendants rely and which is cited *supra*, the plaintiff obtained a temporary restraining order regarding the defendant's acts of interfering with unionizing activity. The dictates of the temporary restraining order merged into a preliminary injunction order. The defendant appealed the case to the Sixth Circuit, but a settlement was reached after oral arguments. It appears, however, that no party informed the circuit of the settlement and, somehow, a rehearing *en banc* was ordered to review the panel's affirmance of the preliminary injunction. Then, another dispute arose, this time about the interpretation of the settlement agreement, and the defendant sought to go forward with the *en banc* rehearing to challenge the propriety of the temporary restraining order and preliminary injunction issued *prior* to settlement. Noting that the parties inexcusably failed to inform the court of their settlement, the Sixth Circuit refused to answer any of the questions on appeal because the settlement rendered the case moot. *Dana Corp.*, 697 F.2d at 724. The court remanded to the district court to dismiss the case. *Id.* The complicated circumstances of *Dana Corp.* differ from the case at bar in that the subsequent dispute here arose from a completely different set of facts supporting a constitutional violation (*i.e.*, the strip searches of Plaintiffs in November 2000) than those giving rise to the first litigation (*i.e.*, the strip searches from 1979 to 1985). Put into terms of the facts in

---

**10.** Interestingly, Defendants praise the *Seiter* Agreement as the be all and end all to the claims in this dispute. In practice, however, they obviously did not abide by the agreement, which prompted the filing of this lawsuit. As the Court stated to Defendants' counsel during oral arguments, "[Y]ou remind me of the orphan who wants mercy of the Court because he's an orphan, having killed both his parents." (Oral Arg. Tr. at 17.) It appears that Defendants are improperly trying to use the *Seiter* Agreement as both a shield and a sword.

*Dana Corp.*, had the defendant in *Dana Corp. again* committed acts of union interference, those acts could certainly be the subject of a new lawsuit. The bottom line is that the *Seiter* litigation or settlement did not resolve the constitutional issues raised by Plaintiffs in this case.[11]

█ Defendants' argument that Muse and Butler lack standing to pursue declaratory relief because they no longer work for the Department presents a much more compelling argument for dismissal (but only as to these plaintiffs and only as to that claim) than the existence of the *Seiter* Agreement. As former employees, Muse and Butler cannot have standing to seek declaratory or injunctive relief because they are no longer subject to the challenged practices (*i.e.*, strip searches by the Department), *see Bordell v. General Elec. Co.*, 922 F.2d 1057, 1060 (2d Cir.1991). Plaintiffs offer nothing to counter this argument.[12] Accordingly, the Court DISMISSES Muse's and Butler's claims for declaratory relief.

With respect to this dismissal, however, the Court makes two notes. First, the claims for declaratory relief are not entirely dismissed because Pierce and Clark still have standing to assert these claims. Second, this standing argument does not apply to any of the plaintiffs on their claims for damages under § 1983 for the searches that already occurred on November 19, 2000. In addition to deterring future con-stitutional deprivations, § 1983 actions serve the purpose of providing compensation to victims of *past abuses*. *Owen v. City of Independence, Mo.*, 445 U.S. 622, 651, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Carter v. City of Chattanooga, Tenn.*, 850 F.2d 1119, 1143 (6th Cir.1988). Thus, even with the dismissal of the claims for declaratory relief as to Muse and Butler, they still remain in this litigation as plaintiffs on the § 1983 claims, while Pierce and Clark carry on the claims for declaratory relief.

As for the Union's standing, Defendants argue that OCSEA lacks standing to seek damages for the violations of its members' constitutional rights. Plaintiffs respond that a trilogy of Supreme Court cases, *Warth*, 422 U.S. 490, 95 S.Ct. 2197, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), and *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), establishes associational standing to seek damages for members' injuries.

As both sides acknowledge, an association has standing where:

"(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the partic-

---

**11.** In this sense, the instant case falls into the exception for mootness articulated by the Supreme Court in *University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (holding that, where one issue in a case has become moot, but the case as a whole remains alive because other issues have not become moot, the federal courts have jurisdiction to decide the live issues). Here, the issues of *Seiter* were rendered moot by the settlement agreement, but the constitutional standard under which strip searches of prison employees was left unresolved.

**12.** At oral arguments, counsel for the Union argued that a grievance was pending as to Muse's termination and that Butler was not barred from regaining employment within the Department. Plaintiffs appear to have abandoned this argument, omitting any discussion of either plaintiff's status in the opposition brief. As will be seen, however, there is little impact on the sum total of this litigation by the dismissal of Muse's and Butler's claims for declaratory relief.

ipation of individual members in the lawsuit."

*Neighborhood Action Coalition v. City of Canton, Ohio,* 882 F.2d 1012, 1016 (6th Cir.1989) (quoting *Brock,* 477 U.S. at 282, 106 S.Ct. 2523). Contrary to Plaintiffs' argument, however, none of the three cases provides direct authority for their argument that an association has standing to pursue *damages* for its members' injuries. In fact, the Supreme Court held that the organizational plaintiff in *Warth* could not seek damages because the injuries suffered were particular to each individual plaintiff, thereby requiring individualized proof. *Warth,* 422 U.S. at 515–16, 95 S.Ct. 2197. Similarly, the Sixth Circuit held that the organizational plaintiff in *Neighborhood Action Coalition* lacked standing to pursue damages because such relief would require individualized proof. *Neighborhood Action Coalition,* 882 F.2d at 1017.

 Following the decisions in *Warth* and *Neighborhood Action Coalition,* the Court finds that the Union lacks standing to pursue damages for its members' injuries. Accordingly, the Court DISMISSES the Union's claims for monetary damages.[13] Nevertheless, an organization without standing to pursue a claim for damages may have standing to pursue declaratory or injunctive relief where partic-

ipation by the individual members is not required. *Id.* Thus, like the plaintiff in *Neighborhood Action Coalition,* 882 F.2d at 1017, the Union may, at this point in the analysis, still pursue its claim for declaratory relief.[14]

## B. *Qualified Immunity*

Defendants raise the defense of qualified immunity to shield them from liability for Plaintiffs' claims.[15] Within the qualified immunity framework, Defendants argue that the strip search of a prison employee on less than individualized, reasonable suspicion is not a clearly established violation of the Fourth Amendment. Plaintiffs respond that the law is clearly established and that Defendants simply, but egregiously, ignored it. Framing the issue backwards, Plaintiffs (somewhat slyly) argue: "It is ... not clearly established that a strip search of prison employees *can be* conducted with any standard less than 'reasonable suspicion.'" (Pls.' Memo. in Opp'n to Summ. J. at 33 (emphasis added).) Of course, the qualified immunity inquiry asks whether the constitutional right advocated by the plaintiff *is* clearly established, not whether a defendant's conduct *is not* clearly established. Plaintiffs are the ones complaining of Defendants' conduct and, thus, bear the burden of proving that Defendants violated the Con-

---

13. Similar to the dismissal of Muse's and Butler's claims for declaratory relief, the dismissal of the Union's claim for damages does not affect the individual plaintiffs' claims for damages and declaratory relief.

14. In this section, the Court has dismissed some plaintiffs as to some claims. The Court, however, continues to use the term "Plaintiffs" throughout the discussion that follows, even though any given discussion may not be applicable to all plaintiffs.

15. As stated in the legal standard, questions of qualified immunity are to be addressed at the forefront of the litigation proceedings.

With that in mind, the Court tailored a case management plan for the specific purpose of giving Plaintiffs ample opportunity for discovery to respond to Defendants' motion (and, accordingly, the defense of qualified immunity contained therein). (Case Management Plan dated Nov. 5, 2001, at 3 (Doc. No. 20).) Although Defendants incorporate a request for summary judgment in their motion, it is still the defense of qualified immunity that they raise and that the Court principally addresses in this memorandum opinion. Accordingly, Plaintiffs' argument to deny Defendants' motion to allow additional discovery is not well-taken.

stitution. Part of Plaintiffs' burden consists of overcoming the defense of qualified immunity.

As indicated in the legal standard section, the first inquiry in a qualified immunity analysis is whether a plaintiff's allegations, if true, establish a constitutional violation. *Hope,* 536 U.S. at 736, 122 S.Ct. 2508; *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Hoover,* 307 F.3d at 466; *Bell,* 308 F.3d at 601. If so, the second inquiry is whether that constitutional violation involved clearly established statutory or constitutional rights of which a reasonable person would have known. *Hope,* 536 U.S. at 739, 122 S.Ct. 2508; *Hoover,* 307 F.3d at 465. The Court proceeds to examine each of these questions in the context of Defendants' strip searches of Plaintiffs.

### 1. *Constitutional Violation Inquiry*

 In this case, the constitutional violations Plaintiffs allege are: (a) unreasonable search and seizure under the Fourth Amendment (Am.Compl.¶¶ 35–40); (b) deprivation of "liberty, privacy, and property" under the Fifth Amendment (Am.Compl.¶¶ 55–58); and (c) equal protection under the Fourteenth Amendment (Am.Compl.¶¶ 59–61).[16] All of these claims stem from the same alleged conduct: Defendants' strip searches of Plaintiffs on November 19, 2000, with less than reasonable suspicion.

### a. *Fourth Amendment Unreasonable Search and Seizure Claim*

The Court begins with Plaintiffs' Fourth Amendment claim, which is the only constitutional claim that raises any serious issue of the applicability of qualified immunity. The Sixth Circuit has not declared the Fourth Amendment standard, reasonable suspicion or otherwise, that must be satisfied before prison employees may be strip searched. "No Supreme Court decision nor any decision of this circuit establishes the rights of prison employees

16. Plaintiffs premise each of these claims, except for the unreasonable search and seizure claim, on the Fourteenth Amendment. The protections of the Fourth Amendment and Fifth Amendment are made applicable to the states through the Fourteenth Amendment. *See Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 542 n. 2, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *see also United States v. Balsys,* 524 U.S. 666, 700, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (Stevens, J., concurring) ("Th[e] [Fifth Amendment] constrains the power of the Federal Government to deprive any person 'of life, liberty, or property, without due process of law,' just as the Fourteenth Amendment imposes comparable constraints on the power of the States."). For their due process claim, Plaintiffs do not identify a federal official or entity as a defendant; thus, despite their citation to the Fifth Amendment, the Court construes their due process claim under the Fourteenth Amendment. For the unreasonable search and seizure claim, Plaintiffs mistakenly identify the Fifth Amendment as a source of applicable law. In the context of this case, no such right exists in the Fifth Amendment, *New York v.*

*Quarles,* 467 U.S. 649, 688 n. 10, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (Marshall, J., dissenting) ("[T]he various exceptions to the Fourth Amendment permitting warrantless searches under various circumstances should have no analogy in the Fifth Amendment context."); *but see Gouled v. United States,* 255 U.S. 298, 306, 41 S.Ct. 261, 65 L.Ed. 647 (1921) (subsequent history omitted) (finding Fifth Amendment violation because the accused is "the unwilling source of the evidence"). The Court interprets Plaintiffs' citation to the Fifth Amendment as misidentifying the Fourteenth Amendment, which, again, affords the people protections of certain amendments (including the Fourth Amendment's protection against unreasonable searches and seizures) against the states. For the equal protection claim, Plaintiffs likewise misidentify the Ninth Amendment as an appropriate source of law. The Ninth Amendment provides that the enumeration of rights in the Constitution shall not operate to deny or disparage other rights retained by the people. U.S. Const. amend. IX. The proper basis for Plaintiffs' equal protection claim is the Fourteenth Amendment.

against a strip-search." *Virgili v. Gilbert,* 272 F.3d 391, 393 (6th Cir.2001). As the court in *Virgili* observed, the only Sixth Circuit case touching on this issue is *Seiter,* which confined its holding to finding that the right of prison employees against strip searches was not clearly established in 1985. *Id.* at 393. Since *Virgili* was decided in 2001 until the date of this memorandum opinion, the *status quo* in this circuit remains: no decision has established the constitutional standard that must be satisfied before prison employees may be strip searched.

 Interestingly, the court in *Seiter,* and again in *Virgili,* faced the same question of qualified immunity in the same context as the Court faces today, but skipped over the constitutional violation inquiry and, instead, addressed only the second prong of the analysis (*i.e.,* whether such a right was clearly established). In view of the Supreme Court's recent holding in *Hope* and the Sixth Circuit cases issued subsequent to that opinion, the Court observes that a proper qualified immunity analysis requires: *first,* an examination of whether a constitutional violation exists in plaintiff's allegations; and *second,* if, and only if, a constitutional violation is found, an examination of whether that right was clearly established at the time it was allegedly violated. *See Hope,* 536 U.S. at 736, 737, 122 S.Ct. 2508; *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir.2002); *Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 531 (6th Cir.2002); *Bell,* 308 F.3d at 601; *Hoover,* 307 F.3d at 465; *see also Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003) (establishing a three-step analysis, but still requiring first a constitutional violation). Thus, a court does not reach the clearly-established prong until the constitutional-violation prong is satisfied.

Aside from the precedent that indicates finding a constitutional violation is the proper first step in a qualified immunity analysis, the Court notes the point of Justice Souter, writing for the majority, in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043, that courts should not assume without deciding a constitutional violation in cases that raise the issue of qualified immunity. *Lewis,* 523 U.S. at 841 n. 5, 118 S.Ct. 1708. "[T]he better approach ... is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *Id.* Justice Souter further noted that the general rule of avoiding determination of constitutional issues does not fit well in a qualified immunity analysis. *Id.* "[I]f the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." *Id.* "An immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional." *Id.* Justice Souter's point has been echoed by at least one circuit court. *Milstead v. Kibler,* 243 F.3d 157, 162 (4th Cir.2001). The logical consequence and apparent danger is that, if courts never ruled on qualified immunity without determining the constitutionality of the challenged conduct, one circuit opinion declaring asserted constitutional rights as not clearly established might lead to an infinite line of cases within that circuit holding the same, even if most or all of the other circuits deemed otherwise. Given the precedent dictating that the constitutional violation inquiry be answered first in a qualified immunity analysis and the legitimate justifications presented above for answering this question, the Court ex-

amines whether a Fourth Amendment violation exists in the context of the strip searches in this case. Thus, in order to answer the threshold inquiry of qualified immunity, the Court must address the following issue of first impression in this circuit: What is the standard under the Fourth Amendment, made applicable to the states through the Fourteenth Amendment, by which a prison-employer may subject its prison-employees to a strip search?

The relevant facts as alleged, which must be taken as true for purposes of this qualified immunity exercise, are simple. On November 19, 2000, the various named individual defendants, in furtherance of their duties as employees of the Department, subjected Pierce, Butler, Brod, Muse, and Clark to strip searches. (Am. Compl. ¶ 21.) Defendants gave verbal notice of the searches only immediately before they were carried out (Am. Compl. ¶ 22), and written notice after the fact (Am.Compl. ¶ 26). Defendants did not provide Plaintiffs their choice of a witness and did not conduct the searches in adequate privacy. (Am.Compl. ¶ 28.) Importantly, Defendants directed and conducted these searches without probable cause or reasonable suspicion. (Am.Compl. ¶ 23.) In fact, evidence offered by Plaintiffs indicating that the searches were conducted on a random basis (Clark Dep. Tr. at 17; Muse Dep. Tr. at 17, 21.) It is also undisputed that these searches were conducted without a warrant.

■ The Fourth Amendment provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. In determining the reasonableness of a search, particularly a physically intrusive search, a court must balance the government's need to conduct the search at issue against the invasion of personal rights entailed by that search. *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *United States v. Keszthelyi*, 308 F.3d 557, 571–72 (6th Cir.2002). Relevant to this analysis are the scope of the intrusion, the manner in which it was conducted, the justification for initiating it, and the place it was conducted. *Wolfish*, 441 U.S. at 559, 99 S.Ct. 1861. Since the circuit has not issued a definitive ruling on this issue, the Court finds useful to look to other courts for guidance and examine how these other courts arrived at their decisions.[17]

The Second Circuit, almost twenty years ago, held that the Fourth Amendment required reasonable suspicion before a pris-

---

17. The Court notes that, *under the second prong of the qualified immunity framework,* looking to other circuits to determine whether a constitutional right is clearly established is not necessarily indicative of the outcome under that prong. *See Higgason v. Stephens,* 288 F.3d 868, 876 (6th Cir.2002) (holding that, in considering clearly established prong, a court should look to Supreme Court, then to own circuit, then to lower courts within circuit, and finally to sister circuits). Since the first prong goes to the more general inquiry of whether a given act amounts to a constitutional violation, which, in this case, is a question of first impression, there is no apparent justification to refrain from looking initially outside the circuit in which this Court sits in order to make this determination. Although this inquiry still remains within the qualified immunity framework, whether conduct amounts to a constitutional violation is not unique to qualified immunity jurisprudence. Thus, the Court freely examines the case law of other circuits for persuasive authority on how to resolve this issue.

on-employer could strip search its prison-employees. *Carey*, 737 F.2d at 204. The facts of that case were similar to that of the instant case. Between 1977 and 1980, the New York State Department of Corrections conducted numerous strip and body cavity searches, some random and some based on tips, of its prison guards at various prison facilities throughout the state. Some of the searches yielded contraband, while others did not. In 1979, the state implemented procedures for conducting these searches, imposing reasonable suspicion as a prerequisite to conduct strip searches.

Weighing the privacy interests of the prison guards to be free from intrusive searches against the government's interests of keeping contraband out of its prisons, the court found balance in a requirement of reasonable suspicion before the state could subject its employees to a strip search. In examining the prison employees' interests, the court applied Justice Harlan's test of privacy [18] and found that these employees held a legitimate expectation of privacy, which was tempered by an employee notice that they would be subject to certain searches during their tenure as prison guards. *Id.* at 201–02. It also found under Justice Harlan's test that society recognized correctional officers have expectations—albeit diminished—to be "free from excessive and unwarranted intrusions based upon unrestrained, standardless exercises of authority by prison administrators." *Id.* at 202. In examining the government's position, the court recognized the legitimate penological interests of maintaining prison security, preserving internal order, and instilling discipline among the inmates. *Id.* at 202–03.

The court held that "warrantless strip searches of correction officers within correctional facilities are not *per se* violative of the fourth and fourteenth amendments of the Constitution." *Id.* at 203. It acknowledged that exceptions exist with respect to the Fourth Amendment requirement of a warrant. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Wolfish*, 441 U.S. at 560, 99 S.Ct. 1861; *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)). From its analysis of the reasonableness test, the court concluded that "a reasonable suspicion standard should govern strip searches of correction officers working in correctional facilities." *Carey*, 737 F.2d at 204.

For additional support, the Second Circuit analogized the reasonable suspicion standard in border crossing cases and prison visitor cases. In border crossing cases, the court observed that "a person entering or leaving the country 'does not expect that his entry or departure, standing alone, will cause him to be subjected to a strip search.'" *Id.* (quoting *United States v. Asbury*, 586 F.2d 973, 975 (2d Cir.1978)). "'Before a border official may insist upon such an extensive invasion of privacy, he should have a suspicion of illegal concealment that is based upon something more than the border crossing, and the suspicion should be substantial enough to make the search a reasonable exercise of authority.'" *Id.* (quoting *Asbury*, 586 F.2d at 975–76). The court went on to say, "Not unlike persons crossing the borders of our country, correction officers, under proper circumstances, may be subjected to strip searches in order to control the flow of contraband." *Id.* In prison visitor cases,

18. Concurring in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Justice Harlan wrote: "[T]here is a twofold requirement, first that a person have established an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring).

the court observed that society would recognize both correction officers and visitors as having higher expectations of privacy outside a prison than inside, that both are unincarcerated individuals who may be sources of contraband for inmates, and that both have diminished expectations of privacy upon entering a prison. *Id.*

The *Carey* court concluded its analysis of the reasonable suspicion standard by noting the Supreme Court's declarations that "prison officials must have freedom to take appropriate action to ensure the safety of inmates and correction personnel." *Id.* "The day-to-day problems of administering and operating correctional facilities are demanding and complex and this reality must be accorded some weight by federal courts even when confronted with constitutional challenges." *Id.* at 205 (citing *Bell,* 441 U.S. at 547, 99 S.Ct. 1861). The solution, the court held, was the reasonable suspicion standard, which upheld Fourth Amendment protection, yet provided sufficient flexibility to keep contraband out of prisons. *See id.*

In 1987, the Eighth Circuit, following the Second Circuit's decision in *Carey,* declared that a reasonable suspicion standard governed strip searches of employees, *McDonell v. Hunter,* 809 F.2d 1302, 1306 (8th Cir.1987). The class action plaintiffs in *McDonell* sought declaratory and injunctive relief in federal court after the prisons in Iowa, for which the plaintiffs worked, threatened to terminate or actually terminated certain employees for refusing to cooperate in urine testing or other search procedures. In written policies, the Iowa prison administrators declared: "Any employee or vehicle entering the grounds of an adult institution or facility may be inspected at any time for security reasons.... If an employee refuses to cooperate in such an inspection, ... the employee refusing to be inspected [may] be relieved of duty pending disposition of the matter."

*Id.* at 1313. Further, the state's policies indicated that "employees may be requested to submit to a strip search of their person and clothing." *Id.* at 1314. The plaintiffs claimed that these policies violated their constitutional rights of privacy and freedom from unreasonable searches and seizures.

The *McDonell* court conducted the same balancing analysis as the *Carey* court. It agreed that correction officers retained an expectation of privacy, but that the expectation was diminished in the prison setting. *Id.* at 1306. At the same time, it recognized the legitimate governmental interest of upholding security in prisons. *Id.* The court found balance in imposing a reasonable suspicion standard on prison searches of correctional officers. *Id.* " '[T]his standard is flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search and seizure powers.' " *Id.* (quoting *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982)).

The most recent circuit decision concerning the standard that governs strip searches of prison employees comes out of the Fourth Circuit, which also decided that a reasonable suspicion standard should apply, *Leverette v. Bell,* 247 F.3d 160, 168 (4th Cir.2001). In that case, the plaintiff was a correctional officer for a South Carolina prison who underwent a pair of strip searches. The first search consisted of requiring the plaintiff to strip, squat, and cough, while the second search consisted of a visual examination of her body cavities. Only the second search, prompted by an inmate's tip, was the subject of the suit. During that search, the plaintiff disrobed at the direction of two female correctional officers. A search of her clothes revealed no contraband. Then, the plaintiff waited, naked, for four or five minutes until a nurse arrived to conduct a body cavity

search. As described by the plaintiff, the search took place as follows:

> I stand up and they are surround[ing] me, [the nurse] and Ms. Bell [the associate warden], and they are not saying anything, but I know she said body cavity search. So I kind of like bend over and they are looking. And Ms. Bell said she can't see, so I bend over a little more, and she stated she couldn't see again. So I bend over a little more, and the third time she says she couldn't see, so I just bent all the way down and put my hand on the floor so she could see. And after that they are there.
>
> So after I bent over I went to sit down. So they are bent down. [The nurse] she is bent down. I am opening my legs and she is looking in my vagina and Ms. Bell said they couldn't see. So I opened them a third time and opened them as far as I could get them. I said, "Ms. Bell, how far do you want me to open them?" and after that they looked, and then [the nurse] looked up at Ms. Bell and just like nod her head like everything was okay, and that was it.

*Id.* at 163–64. The state's policy required "specific objective facts" to justify conducting a strip search, but expressly forbade body cavity searches. *Id.* at 165.

Reviewing *de novo* the district court's denial of the defendants' motion for summary judgment on qualified immunity, the Fourth Circuit conducted the same reasonableness analysis as the Second and Eighth Circuits. Acknowledging that a prison employee does not forfeit all privacy rights, the court also noted that such privacy expectations are diminished in light of the governmental interest of keeping drugs, weapons, and other contraband out of the hands of inmates. *Id.* at 167–68. Relying on, *inter alia, Carey* and cases declaring reasonable suspicion as the standard to search prison *visitors*, the Fourth Circuit adopted the "reasonable and individualized suspicion" standard for conducting visual body cavity searches. *Id.* at 168. Additionally, the court emphasized that the standard to apply was somewhat of a sliding scale, indicating that "the more personal and invasive the search activities of the authorities become, the more particularized and individualized the articulated supporting information must be." *Id.*

The undersigned finds persuasive, even compelling, these courts' decisions to adopt the reasonable suspicion standard and the rationale for these decisions. Indeed, under the appropriate balancing test, correctional officers do not check their Fourth Amendment right against unreasonable searches and seizures at the door to the prison. *See Leverette*, 247 F.3d at 167; *McDonell*, 809 F.2d at 1306; *Carey*, 737 F.2d at 201–02; *see also Armstrong v. New York State Comm'r of Corr.*, 545 F.Supp. 728, 730 (N.D.N.Y.1982); *Gettleman v. Werner*, 377 F.Supp. 445, 451–52 (W.D.Pa.1974). Yet, any expectation of privacy these employees have is unquestionably diminished given the setting of their employment and notice, if any, provided by the state that they may be subject to physical search by entering the premises. *See Leverette*, 247 F.3d at 168; *McDonell*, 809 F.2d at 1306; *Carey*, 737 F.2d at 202; *Armstrong*, 545 F.Supp. at 730; *Gettleman*, 377 F.Supp. at 451–52. Here, no basis exists to distinguish the retention of Fourth Amendment rights by the plaintiffs *sub judice* from that of the plaintiffs in *Leverette, McDonell, Carey, Armstrong*, and *Gettleman*. Similarly, no basis exists to distinguish the prison setting and policies of TCI from that of the defendants in the same cases. As the evidence shows, TCI, like the defendants in the above cases, posted signs indicating that persons entering the facility were subject to search. (Wilson Aff. ¶ 5.) Accordingly, Plaintiffs experience a similar diminution of privacy as above described.

On the other side of the scale, Defendants' interests of securing TCI from drugs and other contraband compete with Plaintiffs' diminished expectation to be free from intrusive strip searches. As indicated by Wilson and undisputed by Plaintiffs, TCI faces a serious problem with keeping its inmates clean of drugs, holding one of the worst records of Ohio prisons for inmate drug testing. (Wilson Aff. ¶ 2.) Undisputedly, Defendants have a strong interest in maintaining security, preserving internal order, and instilling discipline among inmates at TCI and all of its penal institutions. In fact, given Defendants' observation of a worsening trend in inmate drug testing, it seems appropriate that they take a hardline stance on the smuggling of contraband. Thus, unless Defendants are letting their inmates out of the facility to gather contraband themselves, they must examine and cut off the only other means of drug importation: dishonest correctional officers and/or conspiring visitors.

The importation of drugs through visitors are not at issue in this dispute, and the current plaintiffs would have no apparent standing to raise a challenge to Defendants' policies affecting visitors. The flow of drugs into the prison through prison guards, however, *is* at issue in this dispute, and whether Defendants may conduct searches of correctional officers without reasonable suspicion must be resolved in order for the Court to determine the applicability of qualified immunity. Balancing the interests of the correctional officers, Pierce *et al.*, and the competing interests of the Department, the Court holds in accordance with the above decisions that the Fourth Amendment of the Constitution imposes a reasonable suspicion standard that governs strip searches of prison employees. This standard sufficiently upholds Fourth Amendment protection, yet provides adequate flexibility to keep contraband out of the prison. *Carey*, 737 F.2d at 204.

While analogous support for this standard exists in border crossing cases, as the Second Circuit found in *Carey*,[19] stronger analogous support for this standard exists in a Sixth Circuit case in the prison *visitor* setting. Prison authorities must have reasonable suspicion that a visitor bears contraband before conducting a strip or body cavity search on that person. *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir.1995). It seems imprudent for this Court to establish a standard lower than reasonable suspicion for strip searches of correctional officers, whom prison authorities have deemed fit and trustworthy to guard its facility, when the Sixth Circuit has established the reasonable suspicion standard to strip search visitors, whom prison authorities presumably have made no similar evaluation of fitness or trustworthiness. *But see Seiter*, 858 F.2d at 1177 (finding that prison employees pose greater risk of smuggling that visitors because of difference in time spent in prisons and guards' access to sensitive areas). Arguably, prison employees should enjoy a greater degree of Fourth Amendment protection than prison visitors because of their status as employees. The Court, however, does not impose a greater standard, opting instead to follow the well-reasoned opinions and analyses of the Second, Fourth, and Eighth Circuits.

The standard the Court imposes today means that the suspicion to strip search an employee must be articulable, particularized, and individualized. *Lever-*

19. Just as a border official's suspicion of illegal concealment should be based upon something more than the mere fact of a person crossing the border, so should a prison official's suspicion of same be based on something more than the mere fact that a person works in a prison in contact with its inmates.

*ette,* 247 F.3d at 168; *McDonell,* 809 F.2d at 1307; *Carey,* 737 F.2d at 205. Officials must base strip searches on specific, objective facts and rational inferences based on those facts in light of their experience. *McDonell,* 809 F.2d at 1307; *Carey,* 737 F.2d at 205. Moreover, the more personal and invasive the search, the more particularized and individualized the articulable information must be. *Leverette,* 247 F.3d at 168. The factors to be considered are; "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." *Carey,* 737 F.2d at 205; *see Leverette,* 247 F.3d at 168.

Having established the appropriate standard, the question still remains as to whether a constitutional violation exists for purposes of examining Defendants' assertion of qualified immunity. For this part of the analysis, the Court finds useful to consider each of the plaintiffs and the circumstances under which they were strip searched. In the chronological order they were searched, the Court begins with Clark.

 Wilson testified during his deposition that, even before Fuller came to him with specific information about an incoming drug delivery, he had received information about Clark importing drugs from the outside from March 2000 up until two days prior to the searches. (Wilson Dep. Tr. at 30–31.) Moreover, Wilson testified that these prior tips came from two independent sources. (Wilson Dep. Tr. at 32.) The information provided by Fuller came from an inmate, but the substantive information provided in the record is vague at best. Fuller indicated that he conducted an interview with the tipster, that the tipster had provided reliable information in the past, that the interview lasted about two hours, that a large shipment was coming in, and that Clark was involved. (Full-

er Dep. Tr. at 34–41, 46; Wilson Dep. Tr. at 36.) The identity of the tipster, the previous tip he or she provided, the discussion during the two hour interview, and other specifics are not provided. In sharp contrast to this testimony, Clark testified during his deposition that Coleman indicated that *Clark was randomly selected for a strip search.* (Clark Dep. Tr. at 17.) On this point, Coleman testified in his deposition as follows:

Q. Do you recall whether you told him [Clark] in any fashion that it was a random strip search?

A. I do not believe I used the word random. I did not know them to be random strip searches. To the best of my recollection the warden told me at some point—somehow I knew the strip searches were based on information. How I knew that I can't recall.

Q. Okay.

A. I believe that I may have said—I recall myself sticking my hands out with my palms down and saying—kind of patting down, and saying—I don't know if I used the word routine or not but I may have, it's just routine, let's get through it kind of deal.

(Coleman Dep. Tr. at 45.) As shown from this dialogue, Coleman *stops short of a straightforward denial* that he told Clark the search was random. In any event, examining the facts in a light most favorable to Plaintiffs for purposes of this qualified immunity analysis, the Court cannot simply ignore Clark's account, which, as indicated, Coleman does not outright deny. If Clark was randomly selected, a version that the evidence can be interpreted to support especially in view of Muse's testimony discussed next, the Department lacked reasonable suspicion to search him. Accordingly, with respect to Clark, the Court finds a constitutional violation.

As for Muse, who was searched next after Clark, the same basis for a constitu-

tional violation exists. The same tipster who identified Clark identified Muse as being involved in an incoming drug delivery. (Fuller Dep. Tr. 38.) According to Wilson, the first information about Muse's involvement in smuggling contraband into the institution dated back to 1999 and came from as many as ten separate individuals over the course of time up until the searches at issue in this case. (Wilson Dep. Tr. at 30, 34.) In sharp contradiction to these facts, Muse testified that he asked Coleman, "[I]s this some racial thing going on, you picking blacks out to strip search[?]" (Muse Dep. Tr. at 17.) Coleman responded that it was not and that "we're just doing random strip searches." (Muse Dep. Tr. at 17.) Again, examining these facts in a light most favorable to Plaintiffs and also considering Clark's similar testimony, the Court finds a constitutional violation. Strip searching at random, by definition of the word, "random," plainly does not satisfy the Court's reasonable suspicion standard.

For Pierce and Butler, Wilson claimed to have similar information to justify a strip search. Wilson indicated that information on Pierce bringing in contraband dated back to 1999 up until the date of the strip searches. (Wilson Dep. Tr. at 30.) For Butler, the information dated back eight or nine months prior to the searches. (Wilson Dep. Tr. at 31.) The information on Pierce came from ten individuals, while the information on Butler came from four individuals. (Wilson Dep. Tr. at 32–34.)

Again, however, the specifics of the information is not provided in the record. Pierce and Butler do not testify that Coleman or anyone else indicated to them that the searches were random. Coleman's statement to Muse, however, that the searches, plural, were random (Fuller Dep. Tr. at 17) is sufficient to negate the Defendants' claim that the searches were conducted with reasonable suspicion and, therefore, establishes a constitutional violation for qualified immunity purposes.[20]

Having found a constitutional violation for qualified immunity purposes, the Court must continue to the second inquiry within the qualified immunity framework, i.e., whether Defendants' constitutional violation involved clearly established statutory or constitutional rights of which a reasonable person would have known. The Court examines this question *infra* Part III.B.2.

### b. *Equal Protection and Due Process Claims*

The Court next addresses Plaintiffs' equal protection and due process claims. With respect to equal protection, Plaintiffs allege that Pierce, Butler, and Muse were strip searched solely on the tip of an inmate informant who was a member of a white supremacist organization. (Am. Compl.¶¶ 43, 60.) They also allege that Clark was chosen to be strip searched solely because of his race in order to obscure the fact that African–Americans were the targets of suspicion. (Am. Compl.¶¶ 44, 60.) As to due process, Plaintiffs allege that Defendants deprived

---

**20.** Clark's and Muse's accounts indicating that the searches were conducted randomly renders unnecessary, for purposes of this qualified immunity analysis, any examination of the tipster's identity or the information that he or she might have provided. Instead, Fuller's comment to Clark and Muse that the search (or searches) was (or were) random outright negates Defendants' contention that the searches were conducted on the basis of reasonable suspicion, again for purposes of this qualified immunity analysis. The Court calls special attention to the fact that it reaches these conclusions only within the context of qualified immunity because, in other contexts where a plaintiff's version of the facts is not given favorable treatment, such testimony might not have the same effect of establishing a constitutional violation.

and conspired to deprive them of their substantive and procedural due process rights. (Am.Compl.¶¶ 56–57.)

■■■ Plaintiffs do not make it past the first inquiry of the qualified immunity framework on Plaintiffs' equal protection claim.[21] It is well-established, and recently re-affirmed by the Supreme Court, that proof of a racially discriminatory intent or purpose is a prerequisite for a constitutional violation under the Equal Protection Clause. *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Found.*, 538 U.S. 188, 123 S.Ct. 1389, 1394, 155 L.Ed.2d 349 (2003). No evidence supports Plaintiffs' equal protection claim. In their opposition brief, the only evidence Plaintiffs cite is the testimony of Robert Clark, who is Caucasian, that indicates he was selected for a strip search to provide racial balance. (Pls.' Memo. in Opp'n to Summ. J. at 22–23 (citing Clark Dep. Tr. at 34, 49).) Through this testimony, Plaintiffs seek to establish not only that the Department discriminated against Muse, Pierce, and Butler (African–Americans), but also that the Department discriminated against Clark (Caucasian).

■■■ The testimony in Clark's deposition reveals the following colloquy:

Q. Have you had any conversations with any other managers or supervisors at Trumbull Correctional either before or after the search or during it who told you anything else about the search or why it was conducted?

A. Yes, sir. I had been speaking with Rodney Clark because the rumor was directly after the strip search that they had stripped the wrong Clark.

In speaking with him he told me he had called Mr. Schultz and said Mr. Schultz told him no, they weren't trying to search him, they needed a racial balance in their search.

Q. So Rodney Clark told you that Schultz told him—

A. Yes, sir.

Q. —that you were picked for racial balance?

A. Yes, sir.

(Clark Dep. Tr. at 33–34.) Later, during the same deposition, the following questions were asked and answers given:

Q. Give me just a minute.

Just to clarify something, you may have told me this already. When did you talk to Schultz when Schultz told you that you had been picked for racial balance?

A. No, sir, that was when I talked to Rodney Clark.

Q. And he said that Schultz—

A. He said Schultz had told him.

(Clark Dep. Tr. at 49–50.) This testimony constitutes all the evidence Plaintiffs offer to show a discriminatory motive. Plainly, this evidence is not sufficient to establish a constitutional violation because, one, it is merely hearsay, and, two, it is not even an iota of evidence indicating a discriminatory intent or purpose.[22] As Clark's testimony

---

21. Plaintiffs also allege claims under 42 U.S.C. § 1981 (1991) and Ohio Rev.Code § 4112, which are based on the same fact pattern as their equal protection claim. The Court does not address Plaintiffs' claims under § 1981, which protects against *non-governmental* impairment, *Chapman v. Higbee Co.*, 319 F.3d 825, 829–30 (6th Cir.2003), because of the outcome reached on qualified immunity, *infra* Part III.B.2. As for Plaintiffs' claim based on Ohio discrimination law, Ohio Rev.Code § 4112, the Court disposes of that claim *infra* Part III.C.

22. It makes little sense that Clark could use this testimony to prove discriminatory purpose against Caucasians because, if what he claims is true, the Department's attempt to achieve "racial balance" could only serve the purpose of disguising its supposedly true motive: discriminating against African–Ameri-

shows, the information was a rumor. (Clark Dep. Tr. at 33–34.) Accordingly, the Court finds no constitutional violation in Plaintiffs' equal protection claim.[23]

Qualified immunity also shields Defendants from liability on Plaintiffs' due process claim. Before it could reach this conclusion, however, the Court found itself wading through a morass of allegations and arguments that confused the nature of Plaintiffs' due process claim. For example, in the amended complaint, Plaintiffs identified their due process claim as both procedural and substantive, but did not develop either or clearly identify which protected interest they claim Defendants deprived (*i.e.,* life, liberty, and/or property). (Am.Compl.¶¶ 55–58.) Instead, making apparent their misunderstanding of constitutional due process, they allege: "Defendants deprived Plaintiffs of their substantive and procedural rights to due process *as well as* his liberty, *privacy,* and property rights in violation of 42 U.S.C. § 1983." (Am. Compl. ¶ 56 (emphasis added).)

 To make sense of these allegations and arguments, the Court reviews the due process standards beginning with the language of the amendment. The due process clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Procedural due process affords a person with notice and an opportunity to be heard before the government may deprive a person of a protected interest. *See Seal v. Morgan,* 229 F.3d 567, 574 (6th Cir.2000). In addition to this procedural component, the due process clause contains a substantive component, which " 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054 (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). For interests protected by the substantive component, no amount of process will justify their deprivation. *See Lewis,* 523 U.S. at 840, 118 S.Ct. 1708 (holding that Due Process Clause "cover[s] a substantive sphere, barring certain government actions regardless of the fairness of the procedures used to implement them" (internal quotation omitted)); *Planned Parenthood of Southeastern Penn. v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (same); *see also Bartell v. Lohiser,* 215 F.3d 550, 557–58 (6th Cir.2000) ("[I]rrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose.").

With these principles in mind, the Court looks to Plaintiffs' allegations and arguments to find any semblance of potential claims.[24] The amended complaint does not offer much assistance, providing only ge-

---

cans, not Caucasians. Thus, Clark's theory, if true, would only disprove his claim.

**23.** Failure to establish a constitutional violation under the first prong of the qualified immunity analysis with respect to a governmental official in his individual capacity also disposes of any liability on the part of that official in his official capacity. *Hoard v. Sizemore,* 198 F.3d 205, 221–22 (6th Cir.1999). Thus, the individual defendants in their offi-

cial capacity, and therefore the Department as well, face no monetary liability on Plaintiffs' equal protection claims.

**24.** Although the Court does so reluctantly, interpreting a party's claims as stating a procedural and/or substantive due process claim(s), despite that party's failure to distinguish the two in the complaint, is permissible. *See, e.g., Brock v. McWherter,* 94 F.3d 242, 244 n. 1 (6th Cir.1996).

neric allegations and catchphrases of procedural and substantive due process violations. (Am.Compl.¶ 56.) In their brief opposing summary judgment, Plaintiffs clarify that the violations consist of omissions under the Department's search policies, including Defendants' failure to provide advance notice and to afford a witness of each officer's choice to be present. (Pls.' Memo. in Opp'n to Summ. J. at 12–14, 38.) These arguments sound in procedural due process. Plaintiffs also complain that the searches amounted to "disregard for even the most basis [sic] of human rights," that the searches "were not conducted in an environment that was private and respectful of the extreme intrusion into Plaintiffs' privacy that decency would require," and that Defendants have failed to articulate a reason to "trump the provision of these basic human rights and due process guarantees." (Pls.' Memo. in Opp'n to Summ. J. at 38.) These latter complaints sound in substantive due process.

 With both procedural and substantive due process at issue, the Court now turns to the first step of the qualified immunity analysis and concludes that Plaintiffs have failed to establish a constitutional violation under either due process component. On their procedural due process claim, Plaintiffs argue that Defendants' search "[p]olicy [a]ffords [c]onstitutional [d]ue [p]rocess," for which the failure to follow gave rise to a constitutional violation. (Pls.' Memo. in Opp'n to Summ. J. at 12.) Relying on the provisions of the *Seiter* Agreement, as adopted by ODRC Policy No. 310–35, Plaintiffs argue that due process requires, at a minimum, notice and an opportunity for a witness to be present.

Plaintiffs say in their brief: "It is clear that even if Defendants were not required to show cause, they still had some *obligation to provide Plaintiffs with a modi-cum of due process in implementing the search."* (Pls.' Memo. in Opp'n to Summ. J. at 12 (emphasis added).) They further state that they "were not provided with any *notice"* and "were not provided with the *opportunity to have a witness present* while the search was being conducted." (Pls.' Memo. in Opp'n to Summ. J. at 12 (emphasis added).) They proceed in their brief to outline the Department's procedures for strip searches, Policy No. 310–35 and then complain that, "despite the presence of these procedures and binding terms, this state office continues to violate the rights" of the correctional officers. (Pls.' Memo. in Opp'n to Summ. J. at 12–13.) They say: "[T]hese violations have not been nominal in nature either; the searches conducted of the Plaintiffs at hand were *grossly in violation of governing rules.* The defendants were all completely outside the scope of their duties, ... acting in *complete disregard of the applicable procedures."* (Pls.' Memo. in Opp'n to Summ. J. at 13 (emphasis added).) These arguments make clear that the deprivation they complain of lies in the procedures afforded by the *Seiter* Agreement and ODRC Policy No. 310–35, not in anything else. Thus, their asserted liberty interest lies in the above procedures.

 The critical flaw in Plaintiffs' argument, however, is that the Defendants' failure to follow the *Seiter* Agreement and ODRC Policy No. 310–35 does *not* give rise to a *separate* constitutional violation. The threshold determination of a procedural due process claim is the existence of a protected interest. *Prater v. City of Burnside, Ky.,* 289 F.3d 417, 431 (6th Cir.2002); *see also Brock v. McWherter,* 94 F.3d 242, 245 (6th Cir.1996) (holding that initial inquiry into due process claim for deprivation of a property interest is finding a protected property interest). Here, Plaintiffs' asserted liberty interests

are the procedures outlined in the *Seiter* Agreement and the Department's regulations. Such an interest, however, does not comport with the nature of a procedural due process claim. Liberty interests that are afforded protection by the due process clause may arise directly from the Constitution or indirectly from the laws of the state. *Prater,* 289 F.3d at 431–32. Indeed, states may, under certain circumstances, create protected liberty interests that are protected by the due process clause. *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The problem with Plaintiffs' claim, however, is that the procedures outlined in *Seiter* and in the Department's policy do not amount to any substantive interest. There is a distinction between "state-created procedural protections and the substantive liberty interests those procedures are meant to protect." *Smith v. Sumner,* 994 F.2d 1401, 1406 (9th Cir.1993); *see also Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Harris v. McDonald,* 737 F.2d 662, 665 (7th Cir.1984) (mandatory procedural protections cannot, by themselves, be considered a liberty interest). In other words, failing to follow the above procedures does not give rise to a separate constitutional violation under the due process clause. To hold otherwise would run the risk of creating an un-ending cycle of constitutional claims, finding due process rights in due process rights and so on.[25] With no asserted protected interest, Plaintiffs have not alleged a viable constitutional violation under procedural due process.

On Plaintiffs' substantive due process claim, Plaintiffs argue that Defendants disregarded Plaintiffs' "most basi[c] ... human rights." (Pl.'s Memo. in Opp'n to Summ. J. at 38.) They complain that the manner in which the searches were carried out were an intrusion into Plaintiffs' privacy. (Pl.'s Memo. in Opp'n to Summ. J. at 38.) Although Plaintiffs are far from clear, the Court interprets these arguments, combined with the general allegations of the complaint, as an attempt to support a substantive due process claim.

While substantive due process protects against governmental interference with fundamental rights and liberty interests, *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054, this protection does not extend to any of Plaintiffs' asserted rights. That is, the *Seiter* Agreement, ODRC Policy No. 310–35, and even Plaintiffs' asserted right to be free from strip searches are not among the fundamental rights and liberty interests protected by the substantive component of due process. Rather, substantive due process has been defined by the Supreme Court to include a finite number of rights, including "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse lifesaving medical treatment." *Seal,* 229 F.3d at 574–75.

**25.** Instead, the only liberty interest at stake that Plaintiffs could possibly allege in support of a *procedural* due process theory is in a so-called *freedom from strip searches,* the deprivation of which can be achieved only by adhering to the relevant *prison regulations* (i.e., the necessary pre-deprivation process (i.e., the *Seiter* requirements and ODRC Policy No. 310–35)). In such a case, Plaintiffs' due process claim would be rooted in the deprivation of that freedom. Plaintiffs do not make such an argument and the Court finds no reason to raise *sua sponte* the argument, or the claim for that matter, particularly where Plaintiffs are represented by competent counsel. Accordingly, the Court expresses no opinion on the existence of such an interest.

As far as expanding this list, the Supreme Court has openly expressed its reluctance. *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258. The Court stated:

> [W]e have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

*Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258 (internal citations and quotations omitted). The Court observed that substantive due process only protects those rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720–21, 117 S.Ct. 2258 (internal citations and quotations omitted). The government is not allowed to infringe on these rights, no matter what process is involved. *Id.* at 721, 117 S.Ct. 2258.

Given the limited realm of rights protected by substantive due process, and the fact that Plaintiffs have made little effort other than conclusory assertions to fit their claim into this sphere, the Court has little trouble holding that Plaintiffs have not established a constitutional violation based on substantive due process. The provisions of the *Seiter* Agreement and the Department's policy do not rise to the level

of, or even approximate, the fundamental rights or liberty interests identified by the Supreme Court. Moreover, the Court does not identify freedom from strip searches, in the context of this case, as one of those fundamental rights that the Government may not restrict irrespective of process, particularly in the prison setting of this case and particularly when the Court holds *supra* Part III.B.1.a. that the Government may conduct such searches on the basis of reasonable suspicion pursuant to the Fourth Amendment.

 Finally, having determined that Plaintiffs have failed to establish a constitutional violation to support their § 1983 claims under either due process component,[26] the Court need not address Defendants' argument against *respondeat superior* liability as to Wilkinson, Loomis, Coleman, and Schultz (Defs.' Mot. for Summ. J. at 25). Moreover, it would be inappropriate now to allow Plaintiffs to pursue their claim for declaratory relief under the due process clause when they have failed to establish a constitutional violation under the clause. In federal equity cases, the nature of the violation determines the scope of the remedy. *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (internal quotation and citation omitted). Where a district court finds that no constitutional right has been deprived, that court must adhere to the rule that "judicial powers may be exercised only on the basis of a constitutional violation" and refrain from granting equitable relief. *Rizzo*, 423 U.S. at 377, 96 S.Ct. 598 (finding district court's decision to grant equitable relief irreconcilable with

---

**26.** Again, failure to establish a constitutional violation under the first prong of the qualified immunity analysis with respect to a governmental official in his individual capacity also disposes of any liability on the part of that official in his official capacity. *Hoard*, 198 F.3d at 221–22. Thus, the individual defen-

dants in their official capacity, and therefore the Department as well, face no monetary liability on Plaintiffs' due process claims. Additionally, failure to establish a due process violation necessarily disposes of Plaintiffs' conspiracy claim under § 1985 (Am. Compl.¶ 57).

district court's determination that no deprivation of constitutional rights occurred); *accord Davis v. Sch. Dist. of the City of Pontiac, Inc.*, 487 F.2d 890, 892 (6th Cir. 1973) (holding that "[o]nce a past constitutional violation has been established, 'the scope of a district court's equitable powers to remedy past wrongs is broad ....'") (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)). Failing to establish a constitutional violation under the due process clause, Plaintiffs effectively have lost their standing to pursue their claim for declaratory relief under that clause. Accordingly, the Court DISMISSES that claim.

### 2. *Clearly Established Inquiry*

█ The second inquiry in determining whether qualified immunity applies is whether the constitutional violation (which was found in the first half of the analysis only on Plaintiffs' Fourth Amendment Claim, *supra* Part III.B.1.a.) involved clearly established statutory or constitutional rights of which a reasonable person would have known. *Hope*, 536 U.S. at 739, 122 S.Ct. 2508; *Hoover*, 307 F.3d at 465. The test for whether a right is clearly established was set out by the Supreme Court: "[C]learly established rights, for purpose of qualified immunity, are 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hoover*, 307 F.3d at 468 (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727). "A right is clearly established if a reasonable official would understand that what he is doing violates that right." *Id.* It need not be the case that the challenged action was previously held unlawful in order for the test to be satisfied, *Bell*, 308 F.3d at 602; rather, officials can still be on notice even in "novel factual circumstances." *Hope*, 536 U.S. at 741, 122 S.Ct. 2508. Earlier cases involving fundamentally similar facts are instructive. *Bell*, 308

F.3d at 602. In its analysis, a court should look first to decisions of the Supreme Court, then to decisions of the circuit in which the court sits, then to district courts within the circuit, and finally to decisions of other circuits and district court decisions within those other circuits. *See id.*

█ Without any Supreme Court decision on point, the Court looks to decisions of other courts as specified by *Bell*. There is no need to look any further than the decisions of the circuit in which this Court sits. Binding authority from the Sixth Circuit provides an answer to the question of whether the rights at issue in this case were clearly established at the time of the searches. The circuit held in *Seiter*, which was decided in 1988 and involved searches that took place between 1979 and 1985, that "the unreasonableness of the searches as a matter of constitutional adjudication was certainly not established at this juncture, in this circuit." *Seiter*, 858 F.2d at 1178. More recently, the circuit held in *Virgili*, which was decided in 2001 and involved searches that took place in June 1999, that "the standard to be applied to [strip-searches of prison employees] was not clearly established in this circuit in 1999." *Virgili*, 272 F.3d at 394. Based on these circuit decisions, the fact that the strip searches in the instant case took place less than a year and a half after the searches at issue in *Virgili*, and that no party or the Court's own research has come up with a case in this circuit since *Virgili* that justifies straying from this binding precedent, the Court necessarily must follow *Seiter* and *Virgili* and hold that, as of November 2000 (*i.e.*, the date of the challenged searches), the Fourth Amendment standard governing strip searches of prison employees was *not* clearly established. Accordingly, qualified immunity shields Defendants from § 1983 liability under the Fourth Amendment for

strip searching Plaintiffs.[27] Further, Plaintiffs claim for declaratory relief under the Fourth Amendment has been rendered moot by the Court's setting of the reasonable suspicion standard, *supra* Part III. B.1.a. To the extent Plaintiffs seek further or additional declarations under the Fourth Amendment, they now lack standing, like with their due process claim, to proceed with such a claim. Accordingly, Plaintiffs' claim for declaratory relief under the Fourth Amendment is DISMISSED as moot.

### C. *State Law Claims*

The only claims that remain are Plaintiffs' state law claim for breach of contract (Am.Compl.¶¶ 52–54), intentional infliction of emotional distress (Am.Compl.¶¶ 48–51), and discrimination under Ohio Revised Code § 4112 (Am.Compl.¶¶ 44, 46). The Court dismisses these claims for the reasons that follow.

The Court's jurisdiction over Plaintiffs' state law claims is based on 28 U.S.C. § 1367, which states that district courts have supplemental jurisdiction over claims so related to those for which the court has original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(c). A district court, however, may and should decline to exercise supplemental jurisdiction where all claims over which it has original jurisdiction have been dismissed. 28 U.S.C. § 1367(c); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir.1993); *see also Walters v. City of Norton*, No. 97–4270, 1999 WL 357803, at *5 (6th Cir. May 28, 1999) (unpublished table decision). The only basis for original jurisdiction in this case lies in Plaintiffs' constitutional claims. As the Court has granted summary judgment to Defendants on these claims, the Court now declines to exercise its supplemental jurisdiction over Plaintiffs' state law claims.

Moreover, there is a question of whether the Court has supplemental jurisdiction over the state law claims. Defendants assert immunity under, *inter alia*, Ohio Revised Code § 9.86, which provides:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or

---

**27.** Having determined that Plaintiffs' § 1983 claim under the Fourth Amendment does not survive Defendants' qualified immunity defense, the Court need not address Defendants' argument against *respondeat superior* liability as to Wilkinson, Loomis, Coleman, and Schultz (Defs.' Mot. for Summ. J. at 25). It appears, however, that qualified immunity does not apply to government officials sued in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Alkire v. Irving*, 330 F.3d 802, 810–11 (6th Cir.2003). The Department and the individual defendants in their official capacities face no liability under the Fourth Amendment. A suit against individual government employees in their official capacities is essentially a suit against the government entity for which those employees work. *Graham*, 473 U.S. at 165, 105 S.Ct. 3099. Thus, Plaintiffs' suit against the individual defendants in their official capacities is no more than a restatement of the suit against the Department. *See also* Ohio Rev.Code § 121.02(P) (West 2000) (creating department of rehabilitation and correction). Neither a State nor its officials acting in their official capacities are "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir.2003). Thus, the Department and the defendants in their official capacities face no liability under § 1983.

in a wanton or reckless manner. This section does not eliminate, limit, or reduce any immunity from civil liability that is conferred upon an officer or employee by any other provision of the Revised Code or by case law. This section does not affect the liability of the state in an action filed against the state in the court of claims pursuant to Chapter 2743. of the Revised Code.

Ohio Rev.Code § 9.86 (West 1994).

Further, the Ohio code provides:

A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.

Ohio Rev.Code § 2743.02(F) (West 1994).

 As the Sixth Circuit has held, until the Ohio Court of Claims determines the issue of immunity, "there is no cause of action cognizable under Ohio law over which the district court can assert pendent jurisdiction." *Haynes v. Marshall,* 887 F.2d 700, 705 (6th Cir.1989). "A federal court exercising pendent jurisdiction sits as a court of the forum state and is bound to apply its substantive law." *Id.* Jurisdiction over such state law claims must be brought in the Ohio Court of Claims. *Id.*

Moreover, Defendants argue that they have "not consented to suit in federal court on state-law causes of action." They cite Ohio Revised Code § 2743.02 and *Manning v. Ohio State Library Board,* 62 Ohio St.3d 24, 577 N.E.2d 650 (1991), for the proposition that suits against the State of Ohio may be brought only in the Ohio Court of Claims.

From the above case law and statutory provisions, it appears that Plaintiffs' state law claims should have been brought before the Ohio Court of Claims. The Court declines to address this issue, however, given that, in any event, it has declined to exercise its supplemental jurisdiction over the state law claims. Accordingly, the Court DISMISSES without prejudice Plaintiffs' breach of contract and intentional infliction of emotional distress claims.[28]

## IV. CONCLUSION

The Court makes one final note in closing with respect to the establishment of the Fourth Amendment standard, which perhaps dominates all other areas of discussion in this memorandum opinion. Twice, the Sixth Circuit, after finding that the Fourth Amendment standard in this context was not clearly established, ob-

---

**28.** Defendants argue that, if the district court did not incorporate the settlement agreement as part of its order, this Court lacks jurisdiction to enforce its provisions. (Defs.' Mot. for Summ. J. at 20.) Defendants alternatively argue that, if the settlement agreement *was* incorporated, "the order should be enforced by the court that made it—not this Court." (Defs.' Mot. at 21.) The problem with this argument is that Defendants do not know whether the settlement agreement was incor-

porated into the dismissal entry. Indeed, they concede being unable to locate the dismissal entry. (Defs.' Mot. at 19–20 n. 9.) Setting aside the implications of Rule 11 for asserting a defense, the basis for which Defendants admittedly have no knowledge, the Court finds it unnecessary to resolve this argument given the Court's declination of supplemental jurisdiction over all state law claims.

served that ample opportunities exist in the law to establish this area of the law. *Virgili*, 272 F.3d at 394; *Seiter*, 858 F.2d at 1178. In the Court's view, this case presented such an opportunity. "Reasonable suspicion" as the Fourth Amendment standard for the State to strip search prison employees is now on its way to becoming recognized as "clearly established" for qualified immunity purposes.[29] Moreover, to implement this standard not only in the discussion of future opinions of the courts, but also in practice within the state penal institutions, the Court recommends that the Ohio Attorney General, who represented Defendants in this case, distribute this memorandum opinion to the wardens of the state prisons for further publication within those institutions.

For the reasons stated in this memorandum opinion, the Court GRANTS Defendants' "Motion to Dismiss and/or for Qualified Immunity and/or for Summary Judgment" (Doc. No. 55) as follows: Muse and Butler's claims for declaratory relief are DISMISSED for lack of jurisdiction; the Union's claims for money damages are DISMISSED for lack of jurisdiction; the individual plaintiffs have failed to establish a constitutional violation under the Equal Protection Clause and Due Process Clause in order to overcome the first prong of qualified immunity; Pierce, Clark, and the Union's claim for declaratory relief under the Due Process Clause is DISMISSED; Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment claim; Pierce, Clark, and the Union's claim for declaratory relief under the Fourth Amendment is DISMISSED as moot; and Plaintiffs' state law claims are DISMISSED without prejudice.

The Court will publish separately a judgment entry consistent with the language of this memorandum opinion.

IT IS SO ORDERED.

---

**29.** A declaration of this standard by the Sixth Circuit, or the Supreme Court, of course, would serve as a definitive ruling on the clearly established prong in this area of Fourth Amendment jurisprudence. Whether the Sixth Circuit will have an opportunity to address this issue in this case will depend on if and how Defendants attempt an appeal in light of the fact that the Court ultimately ruled in their favor. In any event, the Fourth Amendment standard delineated by this memorandum opinion should not be underestimated. As indicated, when examining the clearly established prong, a court should look to decisions of the Supreme Court, then to decisions of the circuit in which the court sits, *then to district courts within the circuit,* and finally to decisions of other circuits and district court decisions within those circuits. *Bell,* 308 F.3d at 602.